## Settlement of Indigent Persons

ARNOLD, Deputy Attorney General, November 10, 1933.—You have asked us to advise you on two questions which may be summarized as follows:

1. Does the Act of April 11, 1929, P. L. 487, authorize the Department of Welfare to determine the legal residence of indigent persons other than insane, feeble-minded, or epileptic persons, who are returned to this State, and to impose liability for the maintenance of such persons on local poor districts?

2. May persons who are public charges or likely to become public charges, and who have no settlement in Pennsylvania, be returned to another State in which they have a settlement, provided the authorities of such other State consent?

1. The title and the pertinent provisions of the Act of April 11, 1929, P. L. 487, are as follows:

"An act authorizing the Department of Welfare to determine the legal residence of indigent, insane, feeble-minded and epileptic persons, returned to this Commonwealth by the authorities of another State, or transferred from one poor district to another by the department, and requiring the proper district to pay the costs of the care and treatment of such persons in accordance with the laws relating to indigent insane persons.

"Section 1. Be it enacted, &c., That whenever any indigent, insane, feeble-minded or epileptic person is to be returned to this State by the proper authorities of another State, or whenever any such person is to be transferred by the Department of Welfare from one poor district to another as provided by law, the legal residence of such person may be determined by the Department of Welfare, and the commitment of such person shall be made in accordance with such determination and the existing laws. . . ."

Section 2 imposes on the poor district of residence an obligation to pay the cost of care and treatment of such persons.

If it were not for the comma which appears after the word "indigent" in the first sentence of section 1, there could be no question that the authority of the Department of Welfare under this act is limited to insane, feeble-minded and epileptic persons, who, for the sake of brevity, we shall term mental cases.

We are satisfied this act was intended to apply only to mental cases, and that the comma appearing after the word indigent was erroneously placed and must be ignored.

Punctuation contained in the printed volumes of Pennsylvania acts of assembly is not official, and cannot control the interpretation of an act. In Commonwealth v. Reimel, 68 Pa. Superior Ct. 240, 242 (1917), the court said:

". . . As was said in Com. v. Shopp, 1 Woodward 123, 130: 'The marks of punctuation are added subsequently by a clerk or a compositor, and this duty is performed very frequently in an exceedingly capricious and novel way.' Punctuation is not conclusive in the construction of a statute: Gyger's Est., 65 Pa. 311; Montgomery's Est., 63 Pa. Superior Ct. 318; and will not be considered when the sense is clear: Com. v. Taylor, 159 Pa. 451."

Our conclusion as to the intention of the act in question is supported by various parts of the act itself. In the first place, the title imposes on poor districts the obligation to pay for the care and treatment of persons covered by the act "in accordance with the laws relating to indigent insane persons." It is well settled that the title is a part of an act and aids, if need be, in its construction: Glen Alden Coal Co. et al. v. City of Scranton et al., 282 Pa. 45, 51 (1925); Matis et al. v. Schaeffer, 270 Pa. 141, 143 (1921). The title limits the scope of an act: Brink v. Marsh, 53 Pa. Superior Ct. 293, 298 (1913).

If we permitted the comma to govern our interpretation of this act, we should be compelled to construe the act as applying to all insane, feeble-minded, or epileptic persons who are returned to the State, regardless of their condition of indigency. Certainly that was not the intention of the legislature. Likewise, the provision which would apply to persons who are "transferred by the Department of Welfare from one poor district to another as provided by law" could refer only to mental cases, since the Department of Welfare has no authority to remove ordinary poor cases from a district.

The use of the word "treatment" is also significant. It would be almost universally applicable to mental cases. Indigent persons do not necessarily need treatment.

Therefore, we advise you that the Act of April 11, 1929, P. L. 487, does not authorize the Department of Welfare to determine the residence of poor persons returned to this State, other than mental cases, or to impose liability for the maintenance of such persons on any poor district.

2. The Act of June 13, 1836, P. L. 539, sec. 16, as amended by the Act of April 6, 1905, P. L. 115, provides as follows:

"Section 16. On complaint made by the overseers of any district to one of the magistrates of the same county, it shall be lawful for the said magistrate, where any person has or is likely to become chargeable to such district into which he shall come, by his warrant or order, directed to such overseers, to remove such person, at the expense of the district, to the city, district or place where he was last legally settled, whether in or out of Pennsylvania, unless such person shall give sufficient security to indemnify such district to which he is likely to become chargeable, as aforesaid."

In Overseers of the Poor of Limestone Township v. Overseers of the Poor of Chillisquaque, 87 Pa. 294, 298 (1878), the Supreme Court said:

". . . It is indeed true that, by our poor laws, provision is made for the removal of paupers into other states, but this provision is nugatory in that there

is no power by which it can be carried into effect; hence, the order of removal loses all force the moment it crosses the state line. In other words, the legislature of Pennsylvania cannot charge the poor districts of other states with the support of paupers, though their settlements may properly be therein, and, *per contra*, other states cannot so charge the poor districts of Pennsylvania."

It is obvious that a pauper may not be removed from this State to another State without the consent of the proper authorities of the other State. Likewise, no State could return a pauper to Pennsylvania and impose the cost of his maintenance on the public here without the consent of the proper authorities, namely, the directors of the poor of the district to which he is to be returned.

However, if the authorities of a foreign state are willing to permit Pennsylvania to return to them a pauper whose last settlement was in that State, the obstacle suggested by the court in the Limestone Township case is removed.

It is possible that objections to the removal might be made by the indigent person himself, on the ground that he was being deprived of personal liberty without due process of law. But we do not believe that such an objection could be sustained. The Supreme Court of the United States has said that a State, in the exercise of its police power, may exclude from its limits "convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases": Railroad Co. v. Husen, 95 U. S. 465, 471 (1878). So far as we can discover, statutes providing for the removal of paupers from one part of the State to another have never been held to violate any personal constitutional rights. Removal across the State line would involve no different principle.

Therefore, we advise you that if the proper authorities of another State consent, paupers having no settlement in Pennsylvania may be removed to the other State. From C. P. Addams, Harrisburg, Penna.